```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/30/2022
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SUEZ TREATMENT SOLUTIONS, INC.,

                              Plaintiff,

            -against-

ACE AMERICAN INSURANCE COMPANY and
LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

                              Defendants.

---

1:20-cv-06082 (MKV)

**ORDER GRANTING MOTION
FOR JUDGMENT ON THE
PLEADINGS**

MARY KAY VYSKOCIL, United States District Judge:

This case involves a dispute about coverage under two separate insurance policies. Plaintiff Suez Treatment Solutions, Inc. ("Suez") separately purchased from ACE American Insurance Company ("Chubb") and Liberty Mutual Fire Insurance Company ("Liberty") (together, "Defendants") insurance to cover its operations in connection with the development of a pollution treatment system in North Carolina.  When that project ultimately failed, an underlying action sought damages from Suez, among others, for breach of contract, negligence, and fraud.  [ECF No. 39-4, the "Underlying Complaint"].  In this case, Suez seeks a declaratory judgment that, under the insurance policies, Chubb and Liberty are each obligated to defend and indemnify Suez in connection with the underlying case.  [ECF No. 1, the "Complaint"].

Suez moves for partial judgment on the pleadings with respect to the Defendants' duty to defend [ECF No. 37] and filed its memorandum of law in support [ECF No. 38, "Suez Mem."]. Liberty filed a memorandum of law in opposition, stylized in part as its own request for judgment on the pleadings, seeking a determination that Liberty does not owe Suez a duty to defend.  [ECF No. 41, "Liberty Mem."].  Chubb then separately moved for judgment on the pleadings, requesting that the Court determine that Chubb owes no duty to defend [ECF No. 43],

1

and filed a memorandum in support [ECF No. 44, "Chubb Mem."].  Suez filed an omnibus reply

to both the Chubb and Liberty papers [ECF No. 46, "Suez Reply"].  Chubb and Liberty each

subsequently filed a reply, [ECF No. 47, "Chubb Reply"; ECF No. 48, "Liberty Reply"].

On a Federal Rule of Civil Procedure 12(c) motion for judgment on the pleadings—an

unusual procedural posture for a duty to defend case—the Court may consider the Chubb and

Liberty Policies annexed to the Complaint.  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419,

422 (2d Cir. 2011).  A complaint is also "deemed to include . . . materials incorporated in it by

reference [and] documents that, although not incorporated by reference, are 'integral.'"  *Sira v.

Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  The Complaint here explicitly references the underlying

litigation, Compl. ¶ 1, and summarizes the allegations in the Underlying Complaint, Compl. ¶¶

41-44.  Because the Complaint explicitly refers to and relies upon the allegations contained in the

Underlying Complaint, it is incorporated by reference, and is otherwise integral.  *Sira*, 380 F.3d

at 67.  The Court therefore considers the Underlying Complaint and the Policies on these

Motions.

For the reasons discussed herein, the Court grants Suez's motion as to both insurers,

declaring that Chubb and Liberty each owe a duty to defend Suez in the Underlying Action.

## BACKGROUND

## I.      THE UNDERLYING LITIGATION

The underlying case arises from work that Suez performed for the City of High Point,

North Carolina ("High Point" or "the City") to upgrade the facilities at its wastewater treatment

plant starting in 2012.  *See* Underlying Compl. ¶¶ 11, 19-20.  Updated federal standards had

imposed a limit of acceptable mercury emissions from sewage-sludge incinerators.  Underlying

Compl. ¶¶ 14, 18, 25.  After initial tests revealed that High Point's then-existing systems would

not comply with new federal standards, Underlying Compl. ¶ 18, the city's agent "began

working with [Suez on] the installation of a Mercury Removal System." Underlying Compl. ¶ 19. It is alleged that as part of the process, Suez represented that Carbon Process & Plant Engineering S.A.'s ("CPPE") "products and its unique [] mercury removal process in [its system] would best enable" High Point to comply with federal standards and "needed to be the manufacturer of the portions of the [mercury removal system] that CPPE was able to supply and design." Underlying Compl. ¶ 20. Suez represented to the City "that a granulated activated carbon adsorber [the "GAC unit"] designed and manufactured by CPPE" needed to be included as part of the entire treatment system. Underlying Compl. ¶ 21.

According to High Point, "GAC units had rarely, if ever, been used to treat mercury emissions from" sewage-sludge incinerators. Underlying Compl. ¶ 25. Nonetheless the GAC unit was installed in the system "under the supervision of [Suez.]" *See* Underlying Compl. ¶¶ 25, 70. After installation, and before the system "had [] been turned over to [High Point]," Suez and CCPE "undertook to start up" the system in late July 2016. Underlying Compl. ¶¶ 72-73. On August 2, 2016, less than a month later, "a serious leak was discovered in a component [known] as the 'heat exchanger.'" Underlying Compl. ¶ 75. That leak forced the system to shut down, and weeks-long repairs began. Underlying Compl. ¶ 76.

The Underlying Complaint alleges that the day after the system shut down for repairs, "[Suez] and CPPE left" and did not instruct High Point or the plant's operators how the system should be monitored during the shutdown. Underlying Compl. ¶ 80. Shortly thereafter, a plant operator noticed unusually high temperatures in the GAC unit. Underlying Compl. ¶ 81. The shutdown had apparently caused an increase of the carbon monoxide [("CO")] levels inside the GAC. Underlying Compl. ¶ 77. Increased CO levels "indicate that a fire or high-temperature incident is taking place inside the GAC unit." Underlying Compl. ¶ 78. High Point contacted

Suez who instructed the plant to "open an outlet damper on the GAC unit in order to evacuate the heat from the GAC unit." Underlying Compl. ¶ 82. This action had the opposite effect. Underlying Compl. ¶ 83.

The City alleges that the next day "computer readings indicated that the temperature inside the GAC unit had increased even more." Underlying Compl. ¶ 83. CCPE instructed operators to turn on a "startup blower" to cool the GAC unit down. Underlying Compl. ¶ 84. When this only further increased the temperature, CCPE told operators "to drench the carbon inside the GAC unit with water," which they did for the next two weeks. Underlying Compl. ¶¶ 84-85. "The water flowing out of the bottom of the GAC unit during the efforts to extinguish the first fire was extremely acidic, and the burning carbon created high concentrations of toxic sulfur-dioxide gas. It is alleged that these conditions created health and safety hazards at the Treatment Plant and potentially the surrounding area." Underlying Compl. ¶ 86. The fire inside the GAC unit was finally extinguished almost a month after the shutdown by dumping the carbon "out of the bottom of the GAC unit." Underlying Compl. ¶ 87.

According to the City "[f]or months, no work was done on-site by [Suez] or CPPE to repair or replace the GAC unit." Underlying Compl. ¶ 99. High Point further alleges that when work resumed four months after the fire "[Suez] and/or CPPE began a disorganized, poorly planned effort" that "consisted primarily of patching a portion of the fiberglass[,] replacing the destroyed filters[,] and placing new carbon into the GAC unit." Underlying Compl. ¶ 101. This work proved fruitless, as about two months later "the GAC unit experienced a second fire or high-temperature incident during a planned start-up." Underlying Compl. ¶ 110.

Apparently learning from the first fire, High Point this time opted to "dump[] the carbon from the bottom of the GAC unit." Underlying Compl. ¶ 111. Nonetheless, the second fire

caused extensive damage to the unit and the system.  Underlying Compl. ¶ 112.  High Point launched an investigation into the fires and the roles that Suez and CPPE respectively played in the breakdown of the system.  Underlying Compl. ¶ 118.

The City ultimately sued Suez for breach of contract, breach of warranties, negligence, negligent misrepresentations, fraud, and unfair and deceptive trade practices under North Carolina state law.  Underlying Compl. at 22-32 (the "Underlying Case").

## II.    THE INSURANCE POLICIES

Before the issues giving rise to the Underlying Complaint, Suez had purchased two separate insurance policies:  one from Chubb, and one from Liberty Mutual.  The Chubb Policy [ECF No. 39-1] was a "Contractors Pollution Liability and Errors & Omission Insurance Policy." Chubb Policy at SUEZ000005; Chubb Mem. at 3.  The Chubb Policy had a coverage period running from July 24, 2016 to July 24, 2017.  Chubb Policy at SUEZ000067.  The Liberty Policy [ECF No. 39-2] was a "Commercial General Liability" insurance policy with a policy period from March 1, 2016 to March 1, 2017.  *See* Liberty Policy at SUEZ000074; Liberty Mem. at 3.[1] Suez maintains that it purchased the Chubb and Liberty Policies "to protect itself from both professional liability-related claims and products liability-related claims such as those alleged in the Underlying Complaint."  Suez Mem. at 1.  Suez now seeks a declaratory judgment that under the two policies, Chubb and Liberty each independently have a duty to defend Suez in connection with the Underlying Case.

---

[1] Liberty states the policy was "effective 7/24/2016 to 7/24/2017."  Liberty Mem. at 3.  The policy itself says the "policy period is from 03/01/2016 to 03/01/2017."  Liberty Policy at SUEZ000074.  This discrepancy is immaterial since Liberty does not argue that the claims asserted fall outside the coverage period.

### A.   The Chubb Policy

The Chubb Policy states that Chubb has "the right and duty to defend [Suez] against a 'claim' to which this insurance applies."  Chubb Policy at SUEZ000007.  The Chubb Policy has two separate coverage provisions.  "Coverage A" is the "Errors and Omissions Coverage," Chubb Policy at SUEZ000005, while "Coverage B" is the "Contractors Pollution and Emergency Response Coverage," Chubb Policy at SUEZ000005.

Coverage A provides that the Chubb Policy applies to "professional loss," and "any related 'legal defense expense,' . . . which [Suez] becomes legally obligated to pay because of 'claims' arising out of an actual or alleged 'wrongful act' in the performance of 'covered professional services.'"  Chubb Policy at SUEZ000005.  "Covered Professional Services" is defined as "All professional services provided by or on behalf of the named insured in the disciplines of architecture, engineering, design, inspection, testing and. consulting associated with water and wastewater systems, and training of operators of water and wastewater treatment systems."  Chubb Policy at SUEZ00002.  "Wrongful Act" is defined as "any act, error, omission, misstatement, misleading statement or breach of duty actually or allegedly committed or attempted while performing 'covered professional services.'"  SUEZ000011.

Coverage B provides coverage for "'[l]oss' . . . and '[e]mergency response costs' . . . which [Suez] becomes legally obligated to pay because of a 'pollution condition'" that results from a covered operation.  Chubb Policy at SUEZ000005.  "Loss" is defined as ". . . 'property damage,' and 'remediation costs,' including any related 'legal defense expenses[,]'"  Chubb Policy at SUEZ000009.  The Chubb Policy defines "pollution condition" as the "discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant or pollutant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, or waste materials, on, in, into, or upon land and

6

structures thereupon, the atmosphere, surface water or groundwater."  Chubb Policy at SUEZ000010.

The Chubb Policy has a "Products Liability Exclusion" which bars coverage for "'professional loss' . . . arising out of or related to . . . [a]ny goods, products or equipment designed, manufactured, sold, supplied or distributed by [Suez]."  *See* Chubb Policy at SUEZ000014.  The Chubb Policy qualifies the Products Liability Exclusion, providing that the exclusion "shall not apply to 'claims' arising out of the installation of building components associated with 'covered operations.'"  Chubb Policy at SUEZ000014.  "Covered Operations" is defined in the Chubb Policy as "[c]ontracting operations performed by or on behalf of the [Suez] including, but not limited to, operations and maintenance of non-owned water supply and waste water treatment systems."  Chubb Policy at SUEZ000002.  Chubb Policy at SUEZ000014 (emphasis added).

### B.  The Liberty Policy

The Liberty Policy states that Liberty "will pay those sums that [Suez] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  Liberty Policy at SUEZ000090.  The Liberty Policy provides for coverage for "'property damage' caused by an 'occurrence.'"  Liberty Policy at SUEZ000103.  The Liberty Policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property."  Liberty Policy at SUEZ000117.  An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  Liberty Policy at SUEZ000117.  The Liberty Policy further provides that Liberty "will have the right and duty to defend [Suez] against any 'suit' seeking those damages."  Liberty Policy at SUEZ000090.  Typical to a comprehensive general liability policy, the Liberty

7

Policy "does not apply to" "'property damage' expected or intended from the standpoint of the insured." Liberty Policy at SUEZ000091.

The Liberty Policy also includes several exclusions from coverage. The "Professional Liability Exclusion" provides that the Liberty Policy "does not apply to . . . 'property damage' . . . arising out of the rendering of or failure to render any professional services by [Suez] or any engineer, architect or surveyor who is either employed by [Suez] or [is] performing work" on Suez's behalf. Liberty Policy at SUEZ000163. The "Your Work Exclusion" states that the Liberty Policy does not cover "property damage . . . to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" Liberty Policy at SUEZ000094. The "Your Product Exclusion" in the Liberty Policy excludes coverage for "'property damage' to 'your product' arising out of it or any part of it." Liberty Policy at SUEZ000094. The "Pollution Exclusion" excludes coverage for "property damage" that "would not have occurred in whole or in part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants at any time." Liberty Policy at SUEZ0000162. Pollutants is defined as "any solid. liquid. gaseous or thermal irritant or contaminant including smoke. vapor. soot, fumes, acids. alkalis. chemicals and waste" including "materials to be recycled, reconditioned or reclaimed." SUEZ000104.

The Liberty Policy further excludes coverage for "Damage to Impaired Property or Property Not Physically Injured" arising out of either a "defect, deficiency, inadequacy, or dangerous condition in 'your product' or 'your work'" or a "delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." SUEZ000094. "Impaired property" is defined as "tangible property, other than 'your product' or 'your work' that cannot be used or is less useful because a) it incorporates 'your product' or

'your work' that is known or thought to be defective . . . or, b) You have failed to fulfil the terms of a contract or agreement." SUEZ000102. The exclusion does not apply, however, "to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use." Liberty Policy at SUEZ000094.

The Liberty Policy also excludes certain "Damage to Property." Liberty Policy at SUEZ000093. The Damage to Property Exclusion is divided into six subparts. Liberty Policy at SUEZ000093. Relevant here, Section 2.j.(1) of the Liberty Policy excludes coverage for damage to property that Suez "own[s], rent[s], or occup[ies], including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property." Liberty Policy at SUEZ000093. Similarly, Section 2.j.(5) states that the Liberty Policy does not cover "property damage" to "[t]hat particular part of real property on which [Suez or its] contractors or subcontractors working directly or indirectly on [Suez's] behalf are performing operations, if the 'property damage' arises out of those operations." Liberty Policy at SUEZ000094. Finally, Section 2.j.(6) bars coverage of "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." Liberty Policy at SUEZ000094.

## III.   THE SUEZ CLAIM FOR COVERAGE

Suez timely tendered a claim to both insurers. Compl. ¶ 45. Chubb initially agreed to provide a defense, Compl. ¶ 49, but later, while admitting coverage was potentially implicated, reversed course, invoked various exclusions, and disclaimed coverage. Compl. ¶¶ 50-56. Liberty outright denied coverage, refusing to defend Suez in the underlying action. Compl. ¶ 59. At the time Liberty denied coverage, it relied on four exclusions within its insurance policy. Compl. ¶ 59. Neither insurer has, to date, "acknowledged that defense costs, a settlement, or a

judgment in the Underlying Litigation would be covered under either of the policies."  Compl. ¶ 63.

## **LEGAL STANDARD**

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Motions for judgment on the pleadings are assessed under the same standard as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim.  *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).  That is, "[j]udgment on the pleadings is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings."  *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988).  The Court is empowered to consider "the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case."  *L-7 Designs, Inc.*, 647 F.3d at 422 (internal quotation marks omitted). When considering a motion for judgment on the pleadings under Rule 12(c), the Court must accept the facts alleged in the Complaint as true and draw all reasonable inferences in favor of the non-moving party.  *Lively v. WAFRA Inv. Advisory Grp. Inc.*, 6 F.4th 293, 302 (2d Cir. 2021).  However, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## **ANALYSIS**

### I.  **CHOICE OF LAW**

As a threshold matter, the Court must determine what law to apply to this dispute involving two different, separately negotiated insurance policies issued by different insurers. The Chubb Policy includes a choice of law provision that elects New York law for "questions relating to the validity, interpretation, performance, and enforcement" of the policy.  Chubb

Policy at SUEZ000018.  Thus, with respect to the Chubb Policy, the Court applies New York law.

The Liberty Policy does not contain a choice of law provision.  Suez Mem. at 14.  Liberty argues that its policy is governed by either New Jersey or North Carolina law; because New Jersey is where the broker produced the Liberty policy, Liberty Mem. at 10; SUEZ000072, or North Carolina because it is the location of the events underlying this action, Liberty Mem. at 10; *see generally* Underlying Compl.  Liberty ultimately concludes that North Carolina law should not apply, effectively failing to press reliance on its argument with respect to North Carolina law.  *See* Liberty Mem. at 10, 17 ("Liberty submits that New Jersey law governs Suez's claims and the interpretation of the policy.").  Suez urges the Court to apply New York law to the Liberty Policy.  Suez Mem. at 14 n.3.  Because the Liberty Policy contains no choice of law clause, the Court must determine the appropriate law to apply to the interpretation and enforcement of the Liberty Policy.

Where there is a question regarding choice of law, the Court is obligated to conduct its own choice of law analysis.  *See Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941).  Because the Court has jurisdiction over this case by reason of the Parties' diversity, Compl. ¶ 19, and the Court sits in New York, it applies New York's choice-of-law rules.  *Klaxon*, 313 U.S. at 494-96 (federal court sitting in diversity must apply the conflict of law analysis of its forum state); *see Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) ("A federal trial court sitting in diversity jurisdiction must apply the law of the forum state to determine the choice-of-law.").  As a general matter, in a contract case, New York "looks to the 'center of gravity' of a contract to determine choice of law."  *Forest Park Pictures v. Universal TV Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012) (citing *In re Allstate Ins. Co.*, 81 N.Y.2d 219,

226 (1993)).  However, "[u]nder New York choice of law rules, the first inquiry in a case presenting a potential choice of law issue is whether there is an actual conflict of laws on the issues presented."  *Fed. Ins. Co. v. Am. Home Assurance Co.*, 639 F.3d 557, 566 (2d Cir. 2011).  "If not, no choice of law analysis is necessary."  *Id.*  As the Court now explains, the Court need not conduct a choice of law analysis with respect to the Liberty Policy because the law governing an insurer's duty to defend is the same under the law of New Jersey (the law urged by Liberty) and of New York (the law urged by Suez).

## II.     THE DUTY TO DEFEND GENERALLY

New York and New Jersey law are in agreement that the duty to defend in insurance policies is construed broadly.  *Compare Automobile Ins. Co. v. Cook*, 7. N.Y.3d 131, 137 (2006) (the "duty to defend is exceedingly broad") (internal quotation marks omitted), *with Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. at 173 (the "duty to defend comes into being when the complaint states a claim constituting a risk insured against.").  The general rule in both states is that the "duty to defend is determined by the allegations contained within the 'four corners of the [underlying] complaint.'"  Ostrager & Newman, *Handbook on Insurance Coverage Disputes* § 5.02[b] (20th ed. 2021) (noting same rule under both New York and New Jersey law).  It is hornbook law that if the underlying action is *arguably* covered by an insurer's policy, the insurer has a duty to defend.  *See Frontier Insulation Contractors, Inc. v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169, 175, 690 N.E.2d 866, 867 (1997) ("[i]f any of the claims against the insured arguably arise from covered events," the insurer must defend the entire action); *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 174 (1992) ("The duty to defend [] is determined by whether a covered claim is made, not by how well it is made.").  Conversely, it "is well settled that there is no duty to defend cases for which, *as a matter of law*, there is no coverage." Ostrager & Newman § 5.03[a] (emphasis added) (collecting cases); *see also Allstate Ins. Co. v.*

*Zuk*, 78 N.Y.2d 41, 45, 574 N.E.2d 1035 (1991) (no duty to defend where "as a matter of law[,] . . . there is no possible factual or legal basis on which [the insurer] might eventually be obligated to indemnify its insured under any policy provision."); *Hartford Acci. & Indem. Co. v. Aetna Life & Casualty Ins. Co.*, 98 N.J. 18, 21 (1984).  Thus, an insurer does not have a duty to defend if it carries the burden to demonstrate that the "allegations of the complaint are solely and entirely within the policy exclusion."  *Brooklyn Law School v. Aetna Casualty & Surety Co.*, 849 F.2d 788, 789 (2d Cir. 1989 (citing *International Paper Co. v. Continental Casualty Co.*, 361 N.Y.S.2d 873, 320 N.E.2d 619 (1974)); *Ohio v. Casualty Ins. Co. v. Flanagin*, 44 N.J. 504, 514 (1964); Ostrager & Newman § 5.03[d] (collecting cases).

The duty to defend is broader than the duty to indemnify.  *Automobile Ins. Co. v. Cook*, 7 N.Y.3d 131, 137, 850 N.E.2d 1152 (2006); *Voorhees*, 128 N.J. at 173.  In other words, if there is any possibility of coverage, *i.e.*, issues of fact regarding whether a claim is within the scope of coverage or an exclusion bars coverage, the insurer owes a duty to defend.  *Automobile Ins. Co.*, 7 N.Y.3d at 137 ("If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be."); *Voorhees*, 128 N.J. at 173.  Both jurisdictions read any exclusions in the polices narrowly in favor of coverage.  *Compare Pioneer Tower Owners Ass'n v. State Farm*, 12 N.Y.3d 302, 308 (2009) (New York "precedents require [courts] to adopt the readings that narrow the exclusions, and result in coverage."), *with Gibson v. Callaghan*, 158 N.J. 662, 670 (1999) (stating "insurance policy exclusions must be narrowly construed; the burden is on the insurer to bring the case within the exclusion.").  New York and New Jersey law also agree that the plain meaning of the language of the policy shall govern.  *Compare Jin Ming Chen v. Insurance Co. of the State of Pennsylvania*, 36 N.Y.3d 133, 138 (2020) (holding the "language of a policy, when

clear and unambiguous, must be given its plain and ordinary meaning."), *with Gibson*, 158 N.J. at 670 (the "words of an insurance policy are to be given their plain, ordinary meaning.").

The Court cites to New York law in this opinion since the Chubb Policy elects New York law, and the outcome under the Liberty Policy would be the same whether the Court applied New York or New Jersey law. *Fed. Ins. Co.*, 639 F.3d at 566.

## III. CHUBB IS OBLIGATED TO DEFEND SUEZ WITH RESPECT TO THE UNDERLYING CASE

Suez maintains that Chubb has a duty to defend Suez in the underlying action because "the Underlying Complaint includes allegations of wrongful acts arising from 'covered professional services,' specifically, that Suez and CPPE provided professional services on behalf of Suez in the disciplines of design, inspection, testing and consulting that were misleading and ineffective and resulted in two exothermic events." Suez Mem. at 18. Suez further argues in its briefing on this motion (but does *not* so allege in the Complaint) that Coverage B applies as well because "the Underlying Complaint alleges a loss arising from a pollution condition caused by the performance of Suez's covered professional services." Suez Mem. at 20.

Chubb argues that its policy excludes coverage, and therefore it has no duty to defend. Chubb argues that the "Products Liability" Exclusion, applicable to Coverage A and B, "bars coverage for all of the claims in the underlying complaint because the underlying complaint seeks damages from Suez that all stem directly from the failure of the [mercury removal system] that Suez supplied to High Point." Chubb Mem. at 9.

### A. *Suez is Entitled to a Defense Under Coverage A*

Chubb argues that even if the events giving rise to the Underlying Complaint could be covered under Coverage A (which the Court notes Chubb initially conceded when it undertook the defense, Compl. ¶ 49), the Products Liability Exclusion absolves Chubb of any duty to

14

defend.  *See* Chubb Reply at 4, 5.  Because the duty to defend is broader than the duty to indemnify, the question of whether Chubb is obligated to defend the Underlying Case turns on whether the Products Liability Exclusion operates as a complete bar to coverage *as a matter of law*.  *See Allstate Ins. Co. v. Zuk*, 78 N.Y.2d at 45.

The Products Liability Exclusion in the Chubb Policy bars coverage for any suit against Suez "arising out of or related to" "[a]ny goods, products or equipment designed, manufactured, sold, supplied or distributed by [Suez]."  *See* Chubb Policy at SUEZ000014.  The Underlying Complaint does allege that Suez supplied the mercury removal system that caused the loss at the treatment facility and that Suez "served as a sales force, representative *and/or distributor* in the United States for CPPE."  Underlying Compl. ¶ 24; *see also* Underlying Compl. ¶ 133 (Suez breached contract with High Point for "failing to *supply* and install a[ mercury removal system] in conformance with the contract"; Underlying Compl. ¶ 48 (High Point "entered into three separate 'supply' agreements with *suppliers* for equipment to be incorporated into the Project[, and] [o]ne of the 'supply' agreements was with [Suez]").

As Suez points out, however, certain other allegations of damage in the Underlying Complaint relate to professional services rendered at the High Point facility, therefore falling outside the scope of the Products Liability Exclusion and triggering a duty to defend.  *See, e.g.,* Underlying Compl. ¶ 49 ("[U]nlike the other 'supply' agreements, the agreement with [Suez] required *substantially more than the supply* of designated equipment" and also imposed on Suez "design and oversight responsibilities").  Further, while Suez itself may not have initially designed or manufactured the mercury removal system in High Point, *see* Underlying Compl. ¶ 21 (CPPE "designed and manufactured" GAC unit), Suez subsequently modified the designs of the item that later caused the City to sue.  *See* Underlying Compl. ¶¶ 77, 102 (after the first fire,

Suez "either alone or in conjunction with CPPE, [] modified the design of the [mercury removal system].")); Suez Mem. at 21-22.  An insurer's "exceedingly broad" duty to defend is triggered "whenever the four corners of the [underlying] complaint suggest — or the insurer has actual knowledge of facts establishing — a reasonable possibility of coverage."  *Continental Cas. Co. v. Rapid American Corp.*, 80 N.Y.2d 640, 648, 609 N.E.2d 506, 593 N.Y.S.2d 966 (1993) (internal quotation marks and citations omitted).  For example, Suez highlights allegations that Suez "had full responsibility for the oversight and operation of the System," Underlying Compl. ¶ 73, and "failed to properly train 'the City or its operators . . . regarding monitoring the System during the shutdown, or anything else related to the System."  Suez Mem. at 22 (quoting Underlying Compl. ¶ 80).

There is a clear question of fact with respect to whether the damages arose *entirely* from the "design, manufacture, [sale], supply, or distribut[ion]" of the mercury removal system by Suez, or if other actions taken by Suez—such as a failure to train or supervise—also gave rise to the damage at the High Point facility.  *See* Underlying Compl. ¶ 103 (Suez "did not adequately train the City's personnel regarding the changes in the [system] following the first fire."); *id.* ¶ 113 ("The second fire again shut down the Incinerator and caused the City to resume hauling sludge from the Treatment Plant to a landfill."); *id.* ¶ 133 (Suez breached its contract by "failing to provide the City with adequate training").  Because the allegations of the Underlying Complaint are that damage arose from causes other than those within the scope of the Products Liability Exclusion, that exclusion does not, at this stage, preclude coverage as a matter of law.

Chubb conceded as much when it initially agreed to defend Suez.  The law is clear that an insurer, having properly undertaken to defend its insured, must continue to provide defense "until it can confine the claim to a recovery that the policy did not cover."  *Lee v. Aetna Casualty*

& Surety Co., 178 F.2d 750, 753 (2d Cir. 1949) (Hand, J.); Burroughs Wellcome Co. v.

Commercial Union Ins. Co., 632 F. Supp. 1213, 1220 (S.D.N.Y. 1986) (insurer must defend

where "complaint could be read to permit proof, or does not exclude the possibility" of a covered

loss, "until and unless [the insurer] confines a particular plaintiff's claim so as to exclude the

possibility of a recovery for which [the insurer] has provided insurance.").  The typical way for

an insurer to terminate a duty to defend is to obtain a declaratory judgment of no coverage.  *See*

*generally* Ostrager & Newman § 5.05[a].  Chubb does not carry its burden to establish as a

matter of law that the damages in the Underlying Litigation stem entirely from issues that fall

outside the scope of coverage or are otherwise excluded.

### B.       The Court Does Not Consider Whether Coverage B Also Gives Rise to a Duty to Defend

The Court need not consider any argument that Suez raises with respect to Chubb's

obligations under Coverage B.  As Chubb points out, Chubb Mem. at 12 n.4; Chubb Reply at 6

n.3, the request in the Complaint for a declaratory judgment as to Chubb's duty to defend in this

matter implicates only Coverage A.  *See* Compl. ¶ 66 (arguing Chubb must pay for professional

losses).  Suez only claims that it is entitled to coverage under Coverage B for the first time in its

moving papers.  *See* Suez Mem. at 7, 21 ("Chubb Owes a Duty to Defend Under Both Coverage

A and Coverage B").  Suez responds simply that Chubb's claim that the Complaint does not

include a request for declaratory judgment with respect to Coverage B is "wrong," with no

further explanation.  Suez Reply at 11.  Nonetheless, "[a] claim must be set forth in the

pleadings, in order to give defendants fair notice of the nature of the plaintiff's claim." *Thomas*

*v. Egan*, 1 F. App'x. 52, 53 (2d Cir. 2001) (citing Fed. R. Civ. P. 8(a) and *Conley v. Gibson*, 355

U.S. 41, 47 (1957)).  The Court cannot, on a motion for judgment on the pleadings, grant Suez a

declaratory judgment as to Chubb's duty to defend under Coverage B for the simple reason that

Suez did not ask for such relief in its Complaint.  Compl. ¶ 66 (seeking declaratory judgment against Chubb "[p]ursuant to the terms of th[e] policy [under which] Chubb agreed to pay . . . for 'Professional loss . . . in excess of the 'self-insured retention,' which the 'insured' becomes legally obligated to pay because of 'claims' arising out of an actual or alleged 'wrongful act' in the performance of '*covered professional services*.'") (emphasis added); Compl. ¶ 68 "(The Underlying Litigation is a covered claim arising out of an actual or alleged 'wrongful act' against Plaintiff in the performance of Plaintiff's *covered professional services*.") (emphasis added). Accordingly, the Court does not consider now whether Chubb is obligated under Coverage B to defend or indemnify Suez with respect to the Underlying Complaint.

*     *     *

For the foregoing reasons, the Court therefore GRANTS Suez's motion against Chubb for partial judgment on the pleadings, granting declaratory relief with respect to the duty to defend.  For the same reasons, Chubb's motion for judgment on the pleadings is DENIED.

## IV.   LIBERTY IS OBLIGATED TO DEFEND SUEZ
##        WITH RESPECT TO THE UNDERLYING CASE

The Liberty Policy provides comprehensive general liability coverage.  The purpose of a commercial general liability policy is to protect against liability for (*inter alia*) damage to property of others resulting from an occurrence.  *See Nat'l Union Fire Ins. Co. v. Pep Boys*, 304 A.D.2d 218, 759 N.Y.S.2d 42, 45 (N.Y. App. Div. 2003)("[t]he purpose and intent of [a commercial general liability] insurance policy is to protect the insured from liability for essentially accidental injury to the person or property of another rather than coverage for disputes between parties to a contractual undertaking.").  Suez maintains that the Liberty Policy entitles it to be defended by Liberty because it "covers 'property damage' such as 'physical injury to tangible property.'"  Suez Mem. at 23.  Liberty argues that the underlying events was not caused

by an "occurrence" within the meaning of the policy such that a duty to defend is triggered, and that an exhaustive list of exclusions apply, all of which exempt Liberty from any duty to defend. Liberty Mem. at 15-24.  Specifically, Liberty asserts it has no duty to defend on the principle that there is no coverage for expected or intended injuries, and that the exclusions for "Your Work," "Your Product," "Damage to Property," "Damage to Impaired Property," and the "Pollution Exclusion" and the "Professional Liability Exclusion" each operates to exclude coverage.  *See id.*; Liberty Reply at 5-6.  At this early pleading stage, the Court must accept the allegations of the Complaint (and the Underlying Complaint against Suez) as true.  *See Lively*, 6 F.4th at 301. Given the breadth of the duty to defend—which extends to any claim that's *arguably* covered— numerous issues of fact regarding whether there was an occurrence and the operation of the exclusions mean that Liberty has a duty to defend Suez in the underlying action.

### A.   The Underlying Events Arguably Constitute an "Occurrence" Under the Policy, and the Your Work and Your Product Exclusions Do Not Relieve a Duty to Defend

Liberty asserts a blanket denial of coverage, including any duty to defend, arguing that "there is no occurrence alleged in the Underlying Action for which the [Liberty] Policy would respond."  Liberty Mem. at 13.  Liberty maintains that the damage resulting from the underlying events is a result of "faulty workmanship," which "simply does not constitute an occurrence," and thus no coverage is triggered because "the claims against Suez are that Suez failed to deliver the product it agreed to deliver."  Liberty Mem. at 13.  Liberty's reading of the Underlying Complaint selectively ignores other allegations that arguably implicate its coverage and as such trigger a duty to defend.

"Courts have typically found no 'occurrence' or that the work product exclusion applies in cases involving damage to the product the contractor was to construct."  *Savik, Murray & Aurora Constr. Mgt. Co., LLC v. ITT Hartford Ins. Group*, 86 A.D. 3d 490, 497 (1st Dep't

2011).  But, "a covered occurrence may be found where the faulty workmanship creates a legal liability by causing bodily or property damage to something other than the work product."  *Id.* (internal quotation marks omitted); *I.J. White Corp. v. Columbia Casualty Co.*, 501 A.D.3d 531 (1st Dep't 2013) (faulty work causing damage to property other than insured's own product constitutes occurrence).[2]  In evaluating a duty to defend, a defense is owed unless the allegations of the underlying complaint fall unambiguously outside the scope of coverage as a matter of law.  Ostrager & Newman § 5.02[a]-[b].  If any of the claims in the underlying complaint are arguably covered, the insurer must defend.  While the determination of whether an "occurrence" has occurred is often fact dependent, *see* Ostrager & Newman § 8.03[a], the Court cannot say at this stage as a matter of law that there is *no* possibility of coverage.

In disclaiming coverage, Liberty reads the Underlying Complaint too narrowly.  The underlying events giving rise to this suit arguably constitute an "occurrence" within the meaning of the policy.  The Underlying Complaint alleges facts that support an allegation of damage to third party property, beyond the property Suez itself supplied, caused by an accident or repeated exposure to conditions.  *See* Underlying Compl. ¶¶ 90-91 (GAC Unit was "extensively damaged by the first fire, [and] the first fire also *damaged other components* of the System," leaving "the System [] inoperable, [and] the GAC's activated carbon [] unusable"); *id.* ¶ 112 ("[t]he second fire again extensively damaged the GAC unit and *other components* of the System"); *id.* ¶ 134 (system had to be replaced by High Point).  The Court concludes on the present record that an occurrence within the meaning of the Liberty Policy arguably caused damage to property, other than that supplied by Suez, potentially triggering coverage under the Liberty Policy and

---

[2] For the avoidance of doubt, New Jersey law agrees.  *See Cypress Point Condo Ass'n v. Adria Towers LLC*, 226 N.J. 403, 423 (2016) (noting "a strong recent trend in the case law [of most federal circuit and state courts] interpret[ing] the term 'occurrence' to encompass unanticipated damage to nondefective property resulting from poor workmanship.") (internal quotation marks and citation omitted).

obligating Liberty to defend the claim unless and until Liberty can confine the loss to one wholly outside the scope of coverage as a matter of law.

For substantively similar reasons, Liberty's reliance on the "Your Work" and "Your Product" Exclusions is unavailing in connection with the defense obligation.  Liberty Mem. at 19-20.  The "Your Work" Exclusion states that the Liberty Policy does not cover "property damage . . . to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'"  Liberty Policy at SUEZ000094.  The "Your Product" Exclusion excludes coverage for "'property damage' to 'your product' arising out of it or any part of it."  Liberty Policy at SUEZ000094.  The property damage giving rise to the Underlying Complaint was exacerbated by the entire "inadequate" system "operat[ing] unpredictably."  Underlying Compl. ¶ 109.  Accepting the language of the Underlying Complaint, Liberty cannot establish on the pleadings that the alleged damages for which Suez is potentially liable occurred only to Suez' work included in the completed operations hazard.  Therefore the "Your Work" Exclusion does not, at this stage, operate to preclude any possibility of coverage.  Further, even if the Court assumed the "Your Product" Exclusion applied,[3] Liberty's reliance on it is misplaced.  Liberty claims that "[t]his is not a case where the incidents caused damage to the incinerator's structure or anything other than the GAC."  Liberty Mem. at 21; Liberty Reply at 8.  Because the Underlying Complaint does not support such a reading, the "Your Product" Exclusion does not operate to relieve Liberty of a duty to defend.

---

[3] As a threshold matter, the Underlying Complaint *does not* clearly allege that Suez manufactured the mercury removal system.  *See* Underlying Compl. ¶ 30 ("The GAC unit designed and manufactured by CPPE for inclusion in the MRS had a non-standard design"); *id.* ¶ 205 ("CPPE designed and manufactured significant portions of the MRS that SUEZ provided to the City, including the GAC unit"); *id.* ¶¶ 20, 21, 30, 31, 213.  It is unclear, then, why Liberty invokes the "Your Product" Exclusion if it interprets "products" to be "products" Suez "manufactured."

### B.    *Liberty Has Not Carried its Burden to Show Suez Expected or Intended the Damage for Which it is Potentially Liable*

Liberty also disclaims coverage (including any defense obligation) based on the principle

that there is no coverage for expected or intended injuries.  Liberty Mem. at 24.  The argument

derives from the policy language, typical in a comprehensive general liability policy, that

coverage does not apply to property damage that is *expected or intended* "from the standpoint of

the insured."  Liberty Policy at SUEZ000091 (emphasis added).  The "expected and intended"

language is intended to capture the fundamental principle that there can be insurance only for a

fortuitous loss.  Ostrager & Newman § 8.03[b] ("Damage which is expected or intended from the

standpoint of the insured is not fortuitous and therefore not an occurrence."); Ostrager &

Newman § 8.02[a] ("[T]here is an implicit requirement read into every liability insurance policy

that coverage will be provided only for fortuitous losses").

Liberty argues that "the resulting damage sought by [High Point] was expected or

intended" because "under any circumstance where an incinerator and its carbon absorber

malfunction, the expected damage is repair of the damaged unit, operational delays, and

substitute operational costs such as hauling sludge."  Liberty Mem. at 24.  Liberty argues that

there "can be no dispute that [High Point's] damages were anything but probable and expected in

light of a malfunctioning GAC unit."  Liberty Mem. at 25.  Liberty completely misstates the law

on this fundamental concept, which certainly does not operate to relieve Liberty of a duty to

defend on the current state of the record.

Liberty relies on *Voorhees v. Preferred Mutual Insurance Company* for the proposition

that the Court must consider in this case "whether the insured intended to cause the resulting

harm."  Liberty Mem. at 25 (citing 128 N.J. 165, 607 A.2d 1255 (1992)).  Liberty misrepresents

what *Voorhees* held, and the well-developed case law authority on the "expected or intended"

defense.  *See* Ostrager & Newman § 8.03[b].  In *Voorhees*, the court held, "[t]he key issue is whether the court must find a subjective intent to injure, or whether it can presume an intent to injure from the objective circumstances."  *Voorhees*, 128 N.J. at 184.; *see also* Ostrager & Newman § 8.03[c] ("There is substantial authority holding that expectation and intendment are to be judged by a subjective standard.") (collecting cases).  There is no allegation in the underlying case that Suez expected, much less intended to cause the damage for which the underlying plaintiff seeks to hold Suez liable.  Liberty proffers no evidence, and at this stage there is none, that it was Suez's subjective intent to cause the damages at the High Point facility, or that it objectively expected damages could result from its work.  As such, the "Expected or Intended" argument does not relieve Liberty of a duty to defend.

> **C.      *The Pollution Exclusion Does Not Relieve Liberty of a Duty to Defend***

The Pollution Exclusion excludes coverage for "property damage" that "would not have occurred in whole or in part but for the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants at any time."  Liberty Policy at SUEZ0000162.  Liberty alleges that because the "failure of the GAC Unit created sludge" or that it "failed to eliminate the sludge," (which it asserts is a "pollutant"), coverage for any damages for the elimination of the sludge and transportation of the sludge off-site is barred.  Liberty Mem. at 24.  However, Liberty improperly ignores that the Underlying Complaint includes allegations of damage to property that is wholly unrelated to any sludge related causes.  *See, e.g.,* Underlying Compl. ¶ 90 ("The GAC unit was extensively damaged by the first fire."); *id.* ¶ 112 ("The second fire extensively damaged the GAC unit and other components of the System."); *id.* ¶ 121 (post-fire investigation lead High Point to "elect[] to install a different type of pollution-control system, rather than repair" the system incorporating the GAC unit); *id.* ¶¶ 128-29 (High Point paid $2,000,000 in "sludge-hauling fees," and separately "incurred expenses in excess of

$2,500,00 beyond what it would have paid under its various original contracts . . . if the Project had been properly executed.").  Thus, there can be no serious dispute that High Point alleges in the Underlying Complaint property damages from causes other than from the sludge that was dispersed, seeped, migrated, released or escaped as a result of the system failure.  While the Pollution Exclusion *might*, at a later stage of the underlying case, operate to exclude coverage as a matter of law, Liberty cannot establish, as a matter of law, that the allegations of the Underlying Complaint completely fall wholly outside of the coverage it provided.  As such, the Pollution Exclusion does not relieve Liberty of a defense obligation.

> **D.      *The Damage to Impaired Property Exclusion
>            Does Not Relieve Liberty of a Duty to Defend***

For similar reasons, Liberty's reliance on the "Damage to Impaired Property" exclusion does not nullify a duty to defend.  The Impaired Property Exclusion states that the Liberty Policy does not cover "impaired property" "arising out of" either [a] defect. deficiency, inadequacy or dangerous condition in 'your product' or 'your work'" or "[a] delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms."  Liberty Policy at SUEZ000094.  The intent of an "'Impaired Property' exclusion is intended to prevent CGL policies from protecting against the insured's own faulty workmanship or product." *Fireman's Fund Ins v. Amstek Metal, LLC*, 2008 WL 4066096, at *11 (N.D. Ill. Aug. 27, 2008). Liberty argues that because the "damage was to the GAC Unit only," "the Incinerator and System itself [were] the impaired property that was not physically injured," and thus no coverage can attach.  But, as discussed, the Underlying Complaint alleges that property other than the GAC unit, including the system itself, was damaged.  *See* Underlying Compl. ¶ 112 ("The second fire extensively damaged the GAC unit and other components of the System.").

Moreover, to the extent that property other than the GAC unit is "impaired property" within the meaning of the exclusion, the exception to the exclusion potentially applies in this case. The exception states that the exclusion "does not apply to the loss of use of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use." Liberty Policy at SUEZ000094.

Based on the allegations of the Underlying Complaint, Suez is arguably correct that, by the time the first fire took place that damaged other property, Suez's work already had "been put to its intended use" within the meaning of the exception to the Impaired Property Exclusion. Suez Reply at 23. The Underlying Complaint alleges:

- Suez was engaged to bring the High Point facility into compliance with federal standards and help in the installation and design of a mercury removal system. Underlying Compl. ¶¶ 17-18, 44-46, 49;
- Suez instructed High Point on how it "should comply with the [] standards through the installation of the [mercury removal system] incorporating CPPE's products and design, including the GAC unit." Underlying Compl. ¶ 36;
- CPPE delivered the GAC unit to the facility in April 2015. Underlying Compl. ¶ 68;
- By May 2016, the GAC unit had been installed, and CPPE went to the facility "to review the installation." Underlying Compl. ¶ 71;
- Then, in July 2016, Suez "with CPPE's assistance, undertook to start up the Incinerator, and the [mercury removal system], including the GAC unit." Underlying Compl. ¶ 72;
- In August, the system was shut down for repairs to the heat exchanger. Underlying Compl. ¶ 80.

It is manifestly clear that, at least briefly, Suez had overseen the startup of its system, and thus had put its work to "its intended use" of removing pollutants at the High Point facility so as to fall arguably within the exception to the exclusion. The resulting fires occurred after the initial start up of the entire system. The exception to the Impaired Property Exclusion is arguably implicated and, as such, Liberty cannot rely on the exclusion to escape a duty to defend.

In short, while this exclusion may eventually operate to bar coverage, at this (pleading) stage, there are issues of fact regarding its applicability, and thus coverage is arguably owed.  As a result, Liberty cannot escape its obligations to defend its insured.

### E.   The Damage to Property Exclusion Does Not Relieve Liberty of a Duty to Defend

In disputing a duty to defend, Liberty also invokes the Damage to Property Exclusion, which has six subparts.  Liberty Policy at SUEZ000093.  Liberty maintains that the first, fifth, and sixth subparts exclude coverage and relieve it of any duty to defend.  Liberty Mem. at 21-23.

### 1.   Damage to Property Exclusion j.(1)—the "Owned Property" Exclusion

Liberty contends that the "Owned Property" exclusion relieves it of any coverage obligation and it therefore does not owe a defense to Suez in connection with the underlying case.  The Owned Property Exclusion bars coverage for any damage to property that Suez "own[ed]. rent[ed], or occup[ied]" for "repair, replacement, enhancement, restoration or maintenance."  SUEZ00093; Liberty Mem. at 21.  An Owned Property Exclusion is intended to reinforce the concept that a liability policy provides third party coverage, and does not insure against losses to the insured.  Exclusions in insurance policies are read narrowly and according to their plain meaning, and any ambiguity is resolved in favor of the inured.  *See Dean*, 19 N.Y.3d at 708.  In light of that basic principle, and the principles that any ambiguity should be construed against the insurer who has the burden of proof with respect to an exclusion, to the extent that "own" or "occupy" in the Liberty Policy could be stretched beyond their real property definitions, doing so to exclude coverage as a matter of law at the pleading stage in this case is unwarranted.  *See Curran v. Merrimack Mut. Fire Ins. Co.*, 1995 WL 104100, at *4 (S.D.N.Y. Mar. 8, 1995) (an "own, rent, or occupy" exclusion is read according to its "real property usage.").

26

Suez argues that it did not own the damaged property in question or "occupy" the system or the surrounding property damaged by the escaping sludge.  Suez Reply at 19-20.  Liberty rejoins that the "mere fact that Suez did not own the plant in title does not support the denial of Liberty's Motion."  Liberty Reply at 9.  Liberty argues that before the first fire, the system had not been turned back over to the city, Underlying Compl. ¶¶ 73, 89, and after the fire Suez still had not completed work on the project, Underlying Compl. ¶¶ 114-15, thus supporting a reading that Suez "occupied the System and GAC Unit at the time of both fires."  Liberty Mem. at 21.  At the same time, however, Liberty explicitly alleges, in its argument that Exclusion j.(5) applies, that "Suez was working on property *owned by the City* and the property damage arose out of that ongoing work."  Liberty Mem. at 22.  Elsewhere, Liberty argues that the damage was to work within the "completed operations" hazard.  Given these conflicting arguments by Liberty, clearly, questions of fact exist as to whether Suez "owned" or "occupied" the property at issue in the Underlying Complaint.  Those issues of fact regarding the application of the exclusion mean that the Underlying Complaint is arguably covered and, as such, Liberty owes a defense.

### 2.    *Damage to Property Exclusion j.(5)*

The Liberty Policy does not cover "property damage" to "[t]hat particular part of real property on which [Suez or its] contractors or subcontractors working directly or indirectly on [Suez's] behalf are performing operations, if the 'property damage' arises out of those operations."  Liberty Policy at SUEZ000094.  Liberty therefore argues that this exclusion to coverage is triggered because "Suez was working on property owned by [High Point]"—an argument hard to reconcile with Liberty's other arguments, including (*inter alia*) invocation of the "Owned Property" exclusion, *see supra* Section IV.E.1— "and the property damage arose out of that ongoing work."  Liberty Mem. at 22.  However, the Underlying Complaint identifies that

Suez worked on the mercury removal system, and specifically the GAC unit.  Underlying Compl. ¶ 44; *see also id.* ¶¶ 68-71 (detailing Suez and CPPE's delivery and installation of the GAC unit).  Suez did not work on other components of the total system, including at least the incinerator.  Underlying Compl. ¶ 72 (describing the mercury removal system, the incinerator, and the GAC unit as comprising a total system); *id.* ¶ 113 (noting second fire shut down the incinerator).  Because Liberty cannot at this stage of the proceedings confine the underlying claim for damages solely to those arising from damage to the property on which Suez was working, the exclusion does not preclude coverage as a matter of law and Liberty is not excused from its duty to defend.

### 3.   *Damage to Property Exclusion j.(6)*

Liberty finally argues, with respect to the Property Exclusions, that coverage is not owed because Section 2.j.(6) limits coverage of "property damage" to "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  Liberty Policy at SUEZ000094.  In seeking to avoid coverage, Liberty ignores that coverage is expressly retained where the damage to property is "included in the 'products-completed operations hazard.'"  Liberty Policy at SUEZ000094.  The "products-completed operations hazard" is defined as ""all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"  Liberty Policy at SUEZ000104.  Coverage under that hazard is limited to damage caused by products outside Suez's control, or work "that has not been completed."  Liberty Policy at SUEZ000104.  The "products-completed operations hazard" states that whether work is "completed" may be measured by the earlier-discussed "put to its intended use" standard.  Liberty Policy at SUEZ000104.  For the reasons already stated, the work Suez performed had been "put to its intended use," and thus was "completed."  As a minimum, on the present record, the Completed

Operations hazard of the Liberty Policy is potentially triggered and as such Liberty must provide a defense until the claim is confined to one that is wholly outside the scope of coverage as a matter of law.  As such, no exclusion to coverage is warranted.

> **F.**    ***The Professional Liability Exclusion Does Not Relieve Liberty of a Duty to Defend***

Liberty claims that because the Underlying Complaint includes allegations of "design and oversight responsibilities," the Professional Liability Exclusion absolves it from any duty to defend. Liberty Mem. at 18-19.  That Exclusion bars coverage for damage arising out of the rendering of or failure to render any professional services by Suez or any engineer, architect or surveyor who is employed by Suez or who is performing work on behalf of Suez.  SUEZ000163. Such coverage is often provided under a separate errors and omissions or professional services policy.  *See generally* Ostrager & Newman § 7.

Because the Underlying Complaint does not allege that the property damage underlying this action arose solely out of a failure to render professional services, coverage is arguably triggered, *see, e.g., Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass. App. Ct. 318, 322-25 (1991) (declining to exclude coverage for negligence claims related to insured's management or control of waste water treatment plant), and Liberty therefore owes Suez a duty to defend.

*     *     *

For the foregoing reasons, the Court therefore GRANTS Suez's motion against Liberty for partial judgment on the pleadings, granting declaratory relief with respect to the duty to defend.  For the same reasons, Liberty's motion for judgment on the pleadings is DENIED.

## V.    FURTHER CLAIMS AND POTENTIAL MOTION PRACTICE

To the extent that Suez intends to pursue coverage under Coverage B of the Chubb Policy, the Court believes that amendment of Suez' complaint is appropriate in this case.  Fed. R.

Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). Should Suez desire to do so, any amendment shall be made on or before April 29, 2022.

The Court has been advised that after briefing was complete on this motion an amended complaint was filed in the underlying action. *The City of High Point, North Carolina v. Suez Treatment Solutions, Inc., Fidelity and Deposit Company of Maryland, and CPPE Carbon Process & Plant Engineering S.A.,* 1:19-cv-540-LCB (M.D.N.C.), Dkt. No. 64. The Parties have filed seriatim letters arguing that the underlying amended complaint supported their respective positions on this motion. [ECF Nos. 49-53]. The underlying amended complaint is not before the Court on this motion. All Parties elected to proceed by seeking judgment on the pleadings. In granting Suez's Motion for Judgment on the Pleadings as to both insurers, the Court has determined that the Underlying Complaint arguably triggers coverage under both the Liberty and Chubb Policies, and, as such, Liberty and Chubb each owe a duty to defend. An insurer's duty to defend, once triggered, continues until such time as it is established that the claims do not fall within the insurer's coverage. Ostrager & Newman § 5.05[a] (collecting cases); *see also Schnipper v. Home Indem. Co.*, 99 A.D.2d 959, 960, 472 N.Y.S.2d 653, 655 (1984) (where an original complaint stated a cause of action "within the ambit of the policy coverage" the insurer "was obligated, therefore, to provide a defense . . . against that complaint up until the time it was amended."). If Suez intends to amend its complaint, it should make reference to its claims taking into consideration the impact of the new allegations in the underlying amended complaint. To the extent the insurers now contend that the claims in the underlying case have been limited such that there is *no* potential for coverage, they are free to seek leave to move for summary judgment that they owe no coverage and therefore their duty to defend is terminated. The Parties should

consult the Court's Individual Practice Rules in connection with any request for leave to move for summary judgment.

<u>**CONCLUSION**</u>

For the reasons discussed, the Court **GRANTS** Suez's Motion for Judgment on the Pleadings against Liberty and Chubb with respect to the duty to defend.  [ECF No. 37].  The Court **DENIES** the cross-motions filed by Liberty and Chubb for judgment on the pleadings. [ECF Nos. 41, 43].

The Clerk of the Court is respectfully requested to close the motions at ECF Nos. 37 and 43.

**SO ORDERED.**

**Date:   March 30, 2022**
       **New York, NY**

                                  **MARY KAY VYSKOCIL**
                                **United States District Judge**